UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

UNITED STATES OF AMERICA,

                                        **MEMORANDUM & ORDER**

          - against -                    20-CR-213 (KAM)


TYSHAWN CORBETT, et al.,

                    Defendants.

----------------------------------X

KIYO A. MATSUMOTO, United States District Judge:

          On June 18, 2020, a federal grand jury in the Eastern District of New York returned a sealed indictment charging defendants Tyshawn Corbett, Qawon Allen, Devon Bristol, Marlon Bristol, and Quandel Smothers with participating in a racketeering conspiracy, among other crimes.  (ECF No. 1, Indictment.)  The twenty-count indictment in this case arises out of the defendants' alleged participation in Elite Assassin Millas ("E.A.M."), a subset of the Bloods street gang that operates in East New York, Brooklyn, and elsewhere.

          Presently before the court is the defendants' motion to dismiss the indictment for substantial violations of the Jury Selection and Service Act ("JSSA"), 28 U.S.C. § 1861 *et seq.*  (ECF No. 133 ("Defs.' Mot.").)  For the reasons set forth below, the defendants' motion is respectfully DENIED.

**BACKGROUND**

**I.   The JSSA and the EDNY Jury Selection Plan**

The JSSA provides that grand and petit juries in federal court shall be "selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. The statute requires federal districts to establish a jury plan to achieve this purpose. *Id.* § 1863(a). Among other JSSA requirements, a district's plan must select jurors "from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division." *Id.* § 1863(b)(2). A district may supplement these voter lists when necessary to ensure that juries represent a fair cross section of the community. *See id.*

The JSSA requires that a district's jury plan specify procedures for selecting names from these source lists and placing them into a master jury wheel. *Id.* § 1863(b)(3)-(4). The procedures must be designed to "ensure the random selection of a fair cross section of the persons residing in the community" and must ensure that "each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions." *Id.* § 1863(b)(3).

The JSSA requires that a district's jury plan must also ensure the random selection of names from the master jury wheel. *Id.* § 1864(a). The names selected at random from the master wheel are mailed qualification forms to determine their eligibility for jury service. *Id.* Qualified jurors who return the qualification forms and are not exempt or excused are placed into a qualified jury wheel, and those who are randomly selected from the qualified wheel receive summonses for jury service. *Id.* §§ 1865(a), 1866(a).

To implement the JSSA, the Eastern District of New York has established a jury plan that was last amended on October 30, 2006. (ECF No. 133-1 ("Jury Plan").) Under the Plan, the Clerk of Court constructs source lists from voter registration and Department of Motor Vehicles ("DMV") records for each county within the Eastern District. (*Id.* § 4.) The Clerk combines the source lists and randomly selects names for the master jury wheel, which is refilled by September 1 following each presidential election and every two years thereafter. (*Id.* § 5.)

To construct the qualified wheel, the Clerk mails juror qualification forms to persons who are randomly selected from the master wheel. (*Id.* § 6.) Qualified individuals who return the questionnaire – and who are neither exempt nor excused – are placed into the qualified wheel. (*Id.* § 11.) The Clerk randomly draws names from the qualified wheel and summons those drawn to appear for selection panels of grand and petit juries. (*Id.* §§ 13-14.)

## II.   Procedural History

On June 18, 2020, a federal grand jury sitting in Central Islip returned a sealed indictment charging the defendants with a racketeering conspiracy and other offenses.  (ECF No. 1.)  On June 25, 2020, defendant Qawon Allen filed a motion to inspect grand jury records pursuant to the JSSA and to dismiss the indictment for substantial violations of the JSSA.  (ECF No. 10.)  The other defendants later joined in Mr. Allen's motion.  (ECF Nos. 12, 29, 33, 34.)[1]  This court partially granted the motion to inspect on August 21, 2020, ordering the Clerk to make available for inspection various records related to the Jury Plan, the creation of the master and qualified wheels, and the selection of the defendants' grand jury.  (ECF No. 85 at 10-17; *see also* ECF No. 97 (denying reconsideration).)  The court denied the motion to dismiss without prejudice to refiling after the grand jury records were produced to and reviewed by the defendants.  (ECF No. 85 at 2.)  Clerk's Office personnel, working at reduced staffing levels due to the COVID-19 pandemic, provided the requested information under seal on October 7, 2020.  (ECF No. 100.)

On January 4, 2021, defendant Qawon Allen filed a motion for additional records and information, in which all other

---

[1] Although defendants Desmonn Beckett and Andrew Campbell also joined in Qawon Allen's initial motion (*see* ECF Nos. 43, 46), Mr. Beckett and Mr. Campbell subsequently entered guilty pleas (*see* ECF Nos. 109, 120).

defendants joined.  (ECF No. 112; *see* 1/25/21 Minute Entry.)  The defendants sought: (1) the original source files for the voter registration and driver's license lists used to construct the master wheel; (2) correspondence related to those source files; (3) the combined source list that the Clerk of Court used to populate the master wheel; (4) the effective dates for the voter registration and driver's license records; and (5) whether the source files included records for inactive voters, non-driver's license holders, and holders of expired driver's licenses.  (ECF No. 112 at 2.)[2]  The court granted the defendants' requests on January 21, 2021, subject to the court's protective order and the requirement that correspondence related to the source files must have "already [been] in existence."  *United States v. Miller*, 116 F.3d 641, 658 (2d Cir. 1997).  (1/21/21 Minute Entry.)  The Clerk again devoted resources to producing documents pursuant to the protective order and provided documents under seal on January 27, 2021.  (ECF No. 117.)

On May 17, 2021, defendant Qawon Allen filed a motion on behalf of all defendants, seeking clarification regarding a spreadsheet produced by the Clerk in response to the defendants'

---

[2] In addition, defendant Qawon Allen previously sought the names of individuals listed on a spreadsheet of registered voters and driver's license holders, in order to determine whether the spreadsheet reflected the removal of duplicate entries.  (ECF No. 108).  After receiving information that the spreadsheet did not reflect the removal of duplicate entries, Mr. Allen withdrew that request and submitted the revised request detailed above.  (ECF No. 112 at 1.)

request for information about the disposition of potential jurors summoned for the defendants' grand jury. (ECF No. 122.) The Clerk responded to the defendants' requests for clarification on May 19, 2021. (ECF No. 123; *see also* 6/2/21 Minute Entry.)

On June 18, 2021, defendant Qawon Allen renewed the motion to dismiss the indictment on behalf of all defendants. (Defs.' Mot. at 1; *see also* ECF Nos. 132, 136, 137.) The defendants raised three arguments in their motion: (1) their grand jury was not randomly selected from the venire of summoned qualified jurors; (2) the district's jury pool systematically underrepresents Black and Latino persons; and (3) the district's jury selection procedures otherwise violate the JSSA by excluding non-active voters, double-counting certain jurors, and overrepresenting Queens County. (Defs.' Mot. at 1.)

On August 30, 2021, the court terminated the motion without prejudice to allow for the defendants to request additional information from the Clerk regarding the selection of the defendants' grand jury from the venire of summoned qualified jurors. (8/30/21 Minute Entry.) On September 1, 2021, defendant Qawon Allen filed a motion on behalf of all defendants requesting: (1) records concerning the disposition of the 600 potential jurors summoned on October 7, 2019; and (2) the captions and docket numbers for the cases on which the 600 potential jurors were empaneled to serve. (ECF No. 149.) Except for the case names,

which the defendants could obtain using the docket numbers, the court granted the defendants' motion. (9/1/21 Minute Entry; *see also* 9/23/21 Minute Entry.) The Clerk provided the requested information under seal on September 23, 2021. (ECF No. 155.)

After receiving and reviewing this information, defendant Qawon Allen filed a letter stating that he no longer intended to bring an amended motion to dismiss based on the selection of the defendants' grand jury from the venire of summoned jurors. (ECF No. 159 at 1.) Instead, Mr. Allen and the government jointly requested that the court decide the motion based on the other two arguments raised in the papers previously submitted. (*Id.*) The other defendants then joined in the narrowed scope of Mr. Allen's motion. (ECF Nos. 160-63.) As a result, the court will decide the defendants' motion to dismiss based on their arguments that (1) the district's jury pool systematically underrepresents Black and Latino persons and (2) the district's jury selection process violates the JSSA by excluding inactive voters, double-counting certain jurors, and overrepresenting Queens County. (ECF No. 159 at 1; *see* Defs.' Mot. at 13-22.)

## LEGAL STANDARD

The JSSA provides that criminal defendants "shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. To analyze fair cross

section claims under the JSSA, the court applies the same test used for fair cross section claims brought under the Sixth Amendment. *See United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986) (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Under the *Duren* test, the defendants must show that: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the group's representation in the jury venire "is not fair and reasonable in relation to the number of such persons in the community"; and (3) the group's underrepresentation is due to "systematic exclusion" in the jury selection process. *Duren*, 439 U.S. at 364.

A criminal defendant may move to dismiss an indictment based on a "substantial failure to comply with the provisions of [the JSSA] in selecting the grand or petit jury." 28 U.S.C. § 1867(a). "Mere 'technical' violations of the procedures prescribed by the Act do not constitute 'substantial failure to comply' with its provisions." *LaChance*, 788 F.2d at 870 (citation omitted).

## DISCUSSION

### I.  Fair Cross Section Claim

The defendants argue that the district's jury pool does not represent a fair cross section of the community because it systematically excludes Black and Latino persons. (Defs.' Mot. at 13-20.) The defendants attribute this alleged underrepresentation

to two factors: the exclusion of inactive voters and the exclusion of non-driver's license holders. (*Id.* at 18-20.)

### A. First *Duren* Factor

Both parties correctly recognize that Black and Latino persons are "distinctive" groups for purposes of a fair cross section claim. *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995). The first *Duren* factor is thus satisfied.

### B. Second *Duren* Factor

The second *Duren* factor requires the court to determine whether the representation of Black and Latino persons in the jury pool is "fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364. To answer this question, the court must first determine: (1) the jury pool that should be used for the comparison; and (2) the way to measure the representation of Black and Latino persons in that jury pool.

***The Relevant Jury Pool***. The relevant jury pool "may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three." *United States v. Rioux*, 97 F.3d 648, 657 (2d Cir. 1996). The defendants argue that the court should assess the representation of Black and Latino persons based on the qualified wheel, while the government asserts that the court should use the master wheel (*Compare* Defs.' Mot. at 16 n.4 *with* ECF No. 140 ("Gov't's Opp'n") at 26-27.)

Courts in this circuit have defined the relevant jury pool based on "the systematic defect identified by the defendant." *United States v. Celestine*, 2021 WL 4133755, at *4 (E.D.N.Y. Sept. 10, 2021) (collecting cases). In other words, the relevant jury pool is the one that "bears the brunt of the defendant's allegations of systematic exclusion." *United States v. Irizarry*, 2021 WL 3855869, at *3 (S.D.N.Y. Aug. 27, 2021) (quoting *United States v. Schulte*, 2021 WL 1146094, at *4 (S.D.N.Y. Mar. 24, 2021)). For example, in *United States v. Biaggi*, the Second Circuit used the master wheel in determining that the use of voter registration lists did not violate the fair cross section requirement. 909 F.2d 662, 677-78 (2d Cir. 1990). By contrast, in *Rioux*, the Second Circuit used the qualified wheel to assess allegations that undeliverable juror questionnaires violated the fair cross section requirement. 97 F.3d at 657-58.

Here, the defendants' allegations relate to the exclusion of inactive voters and non-driver's license holders from the source lists that are used to construct the master wheel. Though the defendants seek to use the qualified wheel to assess these allegations, the defects they identify "occurred upstream, at the creation of the source lists and master jury wheel." *Celestine*, 2021 WL 4133755, at *4. For that reason, several courts in this circuit have used the master wheel to assess fair cross section claims based on the exclusion of inactive voters. *See*

*United States v. Scott*, --- F. Supp. 3d ----, 2021 WL 2643819, at
*5 (S.D.N.Y. June 28, 2021) ("The Inactive Voter Exclusion . . .
impacted only the creation of the Master Wheel, and had no bearing
on the construction of the Qualified Wheel."); *Irizarry*, 2021 WL
3855869, at *4 ("[T]he omission of 'inactive' voters from the lists
used to create the Master Wheel obviously affects primarily the
Master Wheel." (citations omitted)); *Schulte*, 2021 WL 1146094, at
*4 (using master wheel in case challenging exclusion of inactive
voters).  The same analysis applies to the exclusion of persons
without a driver's license: because such persons are excluded
during the creation of the master wheel, rather than during the
creation of the qualified wheel, the master wheel "bears the brunt
of the defendant's allegations of systematic exclusion." *Schulte*,
2021 WL 1146094, at *4.

          As in *Celestine*, the defendants offer two reasons to use
the qualified wheel instead of the master wheel.  First, they argue
that the "underrepresentation in the source list carries through
to the qualified jury wheel, as well as every other step downstream
in the jury selection process."  (ECF No. 145 ("Defs.' Reply") at
6.)  As Judge Ross recently recognized, however, the qualified
wheel "is made up of jurors who *choose* to return the questionnaire
form," meaning that "there are non-random factors that influence
the composition of the qualified wheel." *Celestine*, 2021 WL
4133755, at *4 (citation omitted).  Because non-random factors

like failing to return the questionnaire influence the composition of the qualified wheel, the master wheel "provides a better indication of underrepresentation" caused by the exclusion of inactive voters and non-driver's license holders. *Id.*

Second, the defendants contend that the court should utilize the qualified wheel because "the only self-reported racial and ethnicity information for the jury is drawn from completed qualification questionnaires." (Defs.' Mot. at 16 n.4.) The government responds that the court can rely on geocoding, a statistical method used to estimate demographic makeup based on the location in which a person lives. (Gov't's Opp'n at 23 n.9.) Although not strictly necessary to its decision, the court finds it appropriate to use geocoding to determine the demographic makeup of the master wheel. *See United States v. Lucas*, 2021 WL 4925715, at *3 (S.D.N.Y. Oct. 21, 2021); *Allen*, 2021 WL 431458, at *3 n.5.

The court recognizes that geocoding lacks the accuracy of self-reported information. (*See* Defs.' Reply at 7.) And in dicta, at least one court in this circuit has declined to rely on geocoding to estimate the demographic makeup of the master wheel. *United States v. Lawrence*, --- F. Supp. 3d ----, 2021 WL 3500838, at *6-7 (S.D.N.Y. Aug. 9, 2021). Due to the non-random factors that influence the composition of the qualified wheel, however, the court finds that geocoding yields estimates that represent a better measure of the alleged racial and ethnic disparities caused

12

by the alleged defects than using the qualified wheel.  *See Lucas*, 2021 WL 4925715, at *3.

In particular, the defendants contend that when applied to the qualified wheel, geocoding overestimates the Black population by 1.71% and the Latino population by 1.37% in absolute terms, and that the method "can be expected to do the same in the master wheel."  (Defs.' Reply at 7.)   The government asserts, however – and the defendants do not meaningfully dispute (*see id.* at 9-10) - that the process of mailing and returning qualification forms introduces larger disparities in the representation of Black and Latino persons.  (Gov't's Opp'n at 30 ("[T]he disparity among the population sent qualification forms is 0.19% for Black individuals and 0.75% for Hispanic individuals (closely mirroring the Master Wheel), but the disparity among individuals who respond to the form is 4.42% for Black individuals and 2.49% for Hispanic individuals.".)   These apparently significant disparities introduced by the questionnaire process persuade the court to analyze the master wheel, which "bears the brunt of the defendant's allegations of systematic exclusion."  *Schulte*, 2021 WL 1146094, at *4; *see also Lucas*, 2021 WL 4925715, at *3 (using geocoding as a "not so rough estimate" of master wheel's composition).

***Measurement of Disparity***.  Courts have historically used three methods to measure a group's representation in a jury pool: absolute disparity, comparative disparity, and statistical

decision theory. Absolute disparity "measures the difference between the group's representation in the general population and the group's representation in the [relevant] wheel." *Rioux*, 97 F.3d at 655. Comparative disparity "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Id.* (citation omitted). Statistical decision theory "measures the likelihood that underrepresentation could have occurred by sheer chance." *Id.*

The "primary approach used in [the Second] Circuit' is the absolute disparity method." *Lawrence*, 2021 WL 3500838, at *7 (alteration original) (quoting *Schulte*, 2021 WL 1146094, at *7); *see also, e.g.*, *Celestine*, 2021 WL 4133755, at *5 ("[T]he absolute disparity approach is the 'favored approach for Sixth Amendment claims.'" (quoting *Scott*, 2021 WL 2643819, at *8)); *Allen*, 2021 WL 431458, at *8 ("The absolute disparity method . . . appears to be the preferred method for analyzing jury underrepresentation under the Sixth Amendment in the Second Circuit.") As in *Celestine*, 2021 WL 4133755, at *5, the defendants do not state a preference for any particular method and argue that "[r]egardless of the method of analysis used, Black and Latino individuals are significantly underrepresented . . . ." (Defs.' Mot. at 16.) The court therefore analyzes the representation of Black and Latino persons using the absolute disparity method.

It is true that, in a narrow set of circumstances, using the absolute disparity method may be inappropriate.  In particular, the Second Circuit has indicated that the comparative disparity method can be used when: "(1) the minority population is a 'tiny percentage of the entire population,' (2) the 'skewed minority representation' results from something less 'benign' than the use of voter registration lists to construct the wheel, and (3) there is 'insufficient data' to conduct the absolute disparity analysis." *Scott*, 2021 WL 2643819, at *8 (quoting *Rioux*, 97 F.3d at 656).  None of those factors are present here.

With respect to the first factor in deciding whether to apply a comparative disparity analysis, the Second Circuit "has not set a specific threshold" for what constitutes a "tiny percentage" of the population.  *Id.* (citation omitted).  In *Biaggi*, however, the Second Circuit used the absolute disparity method when Black and Latino persons made up 19.9% and 15.7% of the population, respectively*.*  909 F.2d at 677-78.  Because Black and Latino persons make up a larger percentage of the population in this case – 20.10% and 16.93% in 2019, respectively (Defs.' Mot. at 16) – using the comparative disparity method is inappropriate.[3]

---

[3] The same holds true if the court considered the population of Black and Latino persons in 2017, the year that the master wheel for the defendants' grand jury was created.  (ECF No. 140-1 ("Siskin Rep't") at 10 (Black and Latino persons represented 20.19% and 16.44%, respectively, of the district's population in 2017.)

The defendants likewise fail to satisfy the second factor for a comparative disparity analysis because, as discussed below, they have not shown that using driver's license records in combination with voter registration lists is any less "benign" than using voter registration lists alone. *See Rioux*, 97 F.3d at 656. Finally, the third factor is not met because both parties' experts have performed analyses using the absolute disparity method, based on sufficient data. (*See* Defs.' Mot. at 16; Gov't's Opp'n at 22-23.) Thus, this case does not fall within the narrow set of circumstances in which using the comparative disparity method may be appropriate.[4]

***Underrepresentation Analysis***. Having resolved these threshold inquiries, the court will use the absolute disparity method to determine whether the representation of Black and Latino persons in the master wheel is "fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364.

"[T]he Second Circuit never has established a bright line with regard to what percentage disparity would constitute

---

[4] The court further notes that "few courts use the statistical decision theory approach to calculate jury underrepresentation." *Celestine*, 2021 WL 4133755, at *5; *see also, e.g.*, *Allen*, 2021 WL 431458, at *7 (SDT is "disfavored"). It is true that the Second Circuit once used SDT to evaluate a Fourteenth Amendment equal protection challenge to a jury selection system and suggested in dicta that such a method might also be applied to fair cross section claims. *See Rioux*, 97 F.3d at 656 (citing *Alston v. Manson*, 791 F.2d 255, 259 (2d Cir. 1986)). "Despite the *Alston* dicta," however, the Second Circuit "returned to the absolute numbers analysis" in subsequent cases. *Id.*

under-representation . . . ." *Irizarry*, 2021 WL 3855869, at *4. In *Biaggi*, the Second Circuit found that disparities of 3.6% and 4.7% "press[sed] . . . the 'absolute numbers' approach to its limit." 909 F.2d at 678. *Biaggi* nonetheless concluded that disparities in this range did not violate the fair cross section requirement because the alleged source of those disparities — the use of voter registration lists — was "benign." *Id.* "Since then, courts in this circuit have repeatedly rejected fair cross section claims where the absolute disparities fall near *Biaggi*'s but the reasons for underrepresentation are benign in nature." *Celestine*, 2021 WL 4133755, at *8 (collecting cases).

Here, the absolute disparities based on the district's population in 2017 (the year the master wheel was constructed) are 0.29% for Black persons and 0.26% for Latino persons. (Gov't's Opp'n at 23.) If based on the district's population in 2019 (the year the defendants' grand jury was selected), the absolute disparities are 0.20% for Black persons and 0.75% for Latino persons. (*Id.* at 22-23.) In either case, the absolute disparities fall "far below those tolerated in *Biaggi*." *Celestine*, 2021 WL 4133755, at *8; *see also, e.g.*, *Scott*, 2021 WL 2643819, at *10 (absolute disparities of 1.25% and 1.15% fell "well below" *Biaggi*'s limit); *Irizarry*, 2021 WL 3855869, at *5 ("Surely, these disparities [of 1.34% and 0.04%] do not rise to a level sufficient to raise constitutional concerns."). Thus, regardless of whether

2017 or 2019 data are used, the defendants have failed to satisfy the second *Duren* factor with respect to the representation of Black and Latino persons in the master wheel.[5]

As discussed above, the Court finds that it is appropriate to assess the defendants' allegations based on the master wheel rather than the qualified wheel.  Even if the court used the qualified wheel, however, the result would not change. Using 2019 data, the absolute disparities in the qualified wheel are 4.45% for Black persons and 2.86% for Latino persons.  (Defs.' Mot. at 16; Gov't's Opp'n at 28.)  Though the absolute disparity for Black persons approaches *Biaggi*'s outer limit, the defendants have failed to show that the alleged causes of the disparity are "less benign" than the reliance on voter registration lists in *Biaggi*.  909 F.2d at 678.  As Judge Ross recently explained, the use of "facially neutral means to construct a jury pool is benign, even if, because of demographic patterns or other 'private sector influences,' these result in disproportionate representation." *Celestine*, 2021 WL 4133755, at *9 (quoting *Scott*, 2021 WL 2643819, at *9).  Because the exclusions of inactive voters by election authorities and non-driver's license holders are "facially neutral

---

[5] The court nonetheless notes its agreement with Judge Ross that "the proper year for measuring the community should match the year in which the defect in process is alleged to have occurred."  *Celestine*, 2021 WL 4133755, at *5.  Here, because the alleged defects occurred with the creation of the master wheel in 2017, the 2017 population represents the best basis for comparison.

and result[] in relatively small disparities," *id.*, the defendants' fair cross section claim fails even if the court applied the absolute disparity method to the qualified wheel.[6]

C. Third *Duren* Factor

The court also concludes that the defendants have failed to satisfy the third *Duren* factor of systematic exclusion. "There is systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces." *Rioux*, 97 F.3d at 658; *see also United States v. Middlebrooks*, 2021 WL 2402162, at *2 (S.D.N.Y. June 10, 2021) (noting that systematic exclusion is "usually the most difficult to establish" (citation omitted)). Here, the alleged defects identified by the defendants — the exclusion of inactive voters and non-driver's license holders — stem from external forces rather than the jury selection process itself.

First, the defendants assert that the exclusion of inactive voters is systematic because "there is reason to believe that inactive voters are more diverse and younger than active voters . . . ." (Defs.' Mot. at 18-19.) Even if true, however,

---

[6] Similarly, the defendants' fair cross section claim would fail even if the court accounted for the alleged underrepresentation attributable to geocoding in the master wheel.  The defendants' expert asserts that geocoding overestimates the Black population by 1.71% and the Latino population by 1.37%. (Defs.' Reply at 7.)  Adding those percentages to the estimates obtained using geocoding, the absolute disparities in the representation of Black persons (2% using 2017 data, 1.91% using 2019 data) and Latino persons (1.63% using 2017 data, 2.12% using 2019 data) still fall below *Biaggi*'s threshold for an unacceptable disparity.

voters are moved to inactive status not by the Clerk of Court, but because New York State has received information that the voter has moved. *See, e.g.*, *Allen*, 2021 WL 431458, at *10. "[B]ecause the exclusion of inactive voters from the wheel is predicated on underlying factors, such as an individual's having moved, this choice . . . does not result in systematic exclusion, and any underrepresentation on account of this choice is a result of external forces." *United States v. Neilly*, 2021 WL 3913559, at *4 (S.D.N.Y. Sept. 1, 2021). Indeed, courts in this circuit have consistently held that the exclusion of inactive voters does not satisfy *Duren*'s third prong. *See, e.g.*, *Middlebrooks*, 2021 WL 2402162, at *3 ("[T]he cause of exclusion is people moving, which courts have held 'is an external force.' It is not systematic." (quoting *Schulte*, 2021 WL 1146094, at *8)); *United States v. Charles*, 2021 WL 2457139, at *5 (S.D.N.Y. June 16, 2021) ("[V]oters become 'inactive' when they move, which constitutes an external force and undermines finding a violation.") Consequently, the defendants cannot show systematic exclusion because the underrepresentation caused by the exclusion of inactive voters is attributable to the external force of people moving. *See Schulte*, 2021 WL 1146094, at *8 ("[T]he Court cannot charge the District's Jury Plan with a Sixth Amendment violation because of how often people move residences throughout the District."). The defendants

cannot show that inactive voters who have moved would still qualify for jury service in the Eastern District of New York.

Second, the defendants argue that the exclusion of non-driver's license holders is systematic because such individuals "are more likely to rely on public transportation, live in the district's urban areas, and be racially diverse than driver's license holders." (Defs.' Mot. at 19.)[7]  Systematic exclusion, however, "does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group." *Charles*, 2021 WL 2457139, at *4 (quoting *United States v. Barlow*, 732 F. Supp. 2d 1, 40 (E.D.N.Y. 2010)).  The exclusion of non-driver's license holders is facially neutral, and any resulting underrepresentation is attributable to "outside causes" – such as "demographic changes" or external socioeconomic forces – that "do not constitute systematic exclusion." *Schulte*, 2021 WL 1146094, at *7 (citation omitted).

---

[7] In addition to challenging the exclusion of non-driver's license holders, the defendants' motion faulted the Clerk for "populating the master jury wheel . . . in proportion to each county's share of the voter registration lists — and not to each county's share of the motor vehicle list or to its census data." (Defs.' Mot. at 20.)  As the government points out, however, this claim appears to be incorrect. (Gov't's Opp'n at 24-25.)  According to the Jury Plan, names are "selected at random" from the source lists to construct the master wheel. (Jury Plan, § 4.)  When the master wheel was refilled in 2017, the Clerk reviewed the results of this random selection process to ensure that the district's counties were substantially proportionally represented in the master wheel, as required by 28 U.S.C. § 1863(b)(3).  (ECF No. 134-1 at 2.)  This comparison was "consistent with an even distribution," meaning that the random selection process resulted in substantially proportional representation for each county. (*Id.*)  Perhaps owing to the Clerk's clarification, the defendants' reply focuses only on the exclusion of inactive voters and non-driver's license holders. (*See* Defs.' Reply at 8-9.)

In their reply, the defendants shift gears in an unpersuasive effort to demonstrate systematic exclusion. Instead of arguing that the exclusion of inactive voters and non-driver's license holders amounts to a systematic defect in the jury selection process, the defendants seek to explain why Black and Latino persons respond to juror questionnaires at a comparatively lower rate. (Defs.' Reply at 10.) In particular, the defendants fault the Jury Plan for the disparities created during the questionnaire process because: (1) the district relies on voter registration addresses rather than more recent motor vehicle records; (2) the master wheel is only refilled every two to three years, causing addresses to become stale; and (3) the district fails to follow-up on non-responsive questionnaires or replace those who fail to respond with other eligible jurors. (*Id.*)

As an initial matter, these arguments are inconsistent with the defendants' claim that the underrepresentation of Black and Latino persons is caused by the exclusion of inactive voters and non-driver's license holders. (Defs.' Mot. at 14, 18.) Inactive voters and non-driver's license holders are excluded from the source lists and the master wheel (*id.* at 2; Gov't's Opp'n at 27), meaning that they are never sent juror questionnaires to begin with. Undeliverable questionnaires are thus irrelevant to the defendants' claim that Black and Latino persons are systematically excluded by virtue of the district's failure to include inactive

voters and non-driver's license holders.  Indeed, as discussed above, it is appropriate to analyze the master wheel precisely because the disparities introduced by the questionnaire process are irrelevant to the defendants' allegations.

In any event, the Second Circuit has squarely rejected a similar attempt to cast undeliverable questionnaires as systematic defects in the jury selection process. *Rioux*, 97 F.3d at 658 ("The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes."). Following *Rioux*, courts in this circuit have consistently rejected arguments like the defendants press in their reply. *See, e.g.*, *Neilly*, 2021 WL 3913559, at *4 ("'[T]he use of voter registration lists, refilling the master wheel at four-year intervals, . . . the exclusion of inactive voters,' and failing to follow up with potential jurors who do not respond to the juror qualification questionnaire are facially neutral practices." (alterations original) (quoting *Lawrence*, 2021 WL 3500838, at *10)); *Middlebrooks*, 2021 WL 2402162, at *3-4 (similar); *Irizarry*, 2021 WL 3855869, at *6 (similar); *Charles*, 2021 WL 2457139, at *4-5 (similar); *Schulte*, 2021 WL 1146094, at *8 (similar); *United States v. Suquilanda*, 2021 WL 3500868, at *4 (S.D.N.Y. Aug. 9, 2021) (similar).

Finally, "[t]o demonstrate systematic exclusion, the Defendant must isolate specific flaws in the Jury Plan and then prove that those flaws are what caused the underrepresentation at issue." *United States v. Tagliaferro*, 2021 WL 1172502, at *3 (S.D.N.Y. Mar. 29, 2021). Here, the defendants merely assert, without proffering supporting evidence relevant to the Eastern District of New York or the time period at issue, that "there is reason to believe" that inactive voters are more diverse than active voters, and that non-driver's license holders are more likely to be diverse than driver's license holders. (Defs.' Mot. at 18-20.) Even if these assertions did not suffer from the defects described above, the defendants have failed to show with "District-specific evidence" that the exclusion of inactive voters and non-licensed New York identification holders caused the underrepresentation at issue. *Celestine*, 2021 WL 4133755, at *10; *see id.* at *11.

## II. Other JSSA Claims

In addition to their fair cross section claim, the defendants assert that the district's jury plan substantially violates the JSSA by (1) excluding inactive voters; (2) double-counting certain prospective jurors; and (3) overrepresenting Queens County. (Defs.' Mot. at 20-22.)

"[C]ourts in our and sister circuits have found that in addition to substantial violations of the fair cross section

24

guarantee, the JSSA is contravened when the alleged violation frustrates the Act's principles of random selection and objective determination of juror disqualification, exemptions and excuses." *Celestine*, 2021 WL 4133755, at *9 (quotations and citation omitted).   Because the JSSA does not require "statistical randomness," however, "courts revert to the *Duren* test to determine if the lack of randomness resulted in impermissible discrimination." *Scott*, 2021 WL 2643819, at *15.   "If there is no discrimination, even in the face of disproportionate representation, there is no substantial violation of the JSSA, because its underlying purpose was not compromised." *Id.; see also, e.g.*, *Celestine*, 2021 WL 4133755, at *10 (analyzing whether alleged violations "permitted the discriminatory selection of grand jurors or prevented [the defendant's] grand jury panel from consisting of a fair cross section of his community").

### A. Exclusion of Inactive Voters

As discussed above, the exclusion of inactive voters does not result in impermissible discrimination against Black or Latino persons.   Defendants' standalone JSSA claim based on the exclusion of inactive voters thus fails for the same reasons as their fair cross section claim.   This result is consistent with numerous other courts in this circuit, which have held that the exclusion of inactive voters is not actionable under the JSSA. *See, e.g.*, *Middlebrooks*, 2021 WL 2402162, at *4 ("[E]ven if the

exclusion of inactive voters is a violation of the JSSA, it is certainly a technical violation." (quoting *Allen*, 2021 WL 431458, at *10)); *Suquilanda*, 2021 WL 3500868, at *4 (exclusion of inactive voters amounts to a "nonactionable 'technical violation[]' at best" (citation omitted)); *Scott*, 2021 WL 2643819, at *15 (exclusion of inactive voters does not violate JSSA); *Celestine*, 2021 WL 4133755, at *10 (exclusion of inactive voters does not substantially violate the JSSA).

### B. Double Counting

The defendants also argue that the district's jury-selection processes violate the JSSA because certain jurors are more likely to be selected than others.  In particular, the defendants assert that the Clerk's combined source list has 2,008,918 more entries than the district's jury eligible population, a disparity they attribute to the failure to adequately deduplicate the list.  (Defs.' Mot. at 21-22.)  Because duplicated entries have a higher chance of being selected, the defendants argue that the selection process transgresses the Jury Plan's requirement for "the mathematical odds of any single name being picked [to be] substantially equal."  (Jury Plan, § 4; *see* Defs.' Mot. at 22.)

As discussed above, however, courts assessing standalone JSSA claims "revert to the *Duren* test to determine if the lack of randomness resulted in impermissible discrimination." *Scott*, 2021

WL 2643819, at *15.  The defendants offer no evidence that the allegedly inadequate deduplication resulted in impermissible discrimination against Black persons, Latino persons, or any other distinctive group.  Having failed to tie their claim back to discrimination against a particular group, the defendants' JSSA claim based on inadequate deduplication cannot succeed.  *See Celestine*, 2021 WL 4133755, at *11 ("[A]bsent a showing that the jury selection process permitted the discriminatory selection of jurors or prevented jury panels from consisting of fair cross sections of the community, [the defendant's] substantial violation claim fails.").

> C. Geographical Representation

Finally, the defendants assert that the district's jury pool violates the JSSA because it overrepresents Queens County by 2.55%.  (Defs.' Mot. at 22.)  The JSSA requires that "each county, parish, or similar political subdivision within the district or division [be] substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions."  28 U.S.C. § 1863(b)(3).  Again, however, succeeding with such a standalone JSSA claim requires showing that the violation "result[s] or ha[s] the potential to result in discrimination among cognizable groups of prospective jurors."  *Celestine*, 2021 WL 4133755, at *10 (citation omitted).

"[G]eographical groupings are not cognizable under the JSSA or the Sixth Amendment." *Id.* at 11 (quoting Scott, 2021 WL 2642819, at *16 n.3). As in *Celestine*, the defendants make no effort to tie Queens County's alleged overrepresentation to discrimination against a cognizable group. *See id.* Because the defendants fail to make such a connection, their JSSA claim based on the overrepresentation of Queens County fails.

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is DENIED.

SO ORDERED.

/s/ Kiyo A. Matsumoto
Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York

Dated:    Brooklyn, New York
          November 30, 2021